## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **OMARI GEORGE**, a minor; **DARYL GEORGE** and **BRENDA BARNES-GEORGE**, individually and as Parents and Natural Guardians of Omari George,<br><br>**Plaintiffs,**<br><br>v.<br><br>**BOARD OF EDUCATION OF THE TOWNSHIP OF MILLBURN**; **RICHARD BRODOW**, personally and in his Official Capacity; **WILLIAM MIRON**, personally and in his official capacity; and **MICHELLE PITTS**, personally and in her Official Capacity,<br><br>**Defendants.** | Civ. No. 2:11-cv-00043 (WJM)<br><br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

     Plaintiffs O.G., Daryl George, and Brenda Barnes-George allege race-based discrimination at Millburn High School. Plaintiffs further allege that the Board of Education of the Township of Millburn (the "Board") violated O.G.'s due process rights when it expelled O.G. from school. The four Defendants—the Board and three Millburn school administrators—each move for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendants' motion is **GRANTED IN PART**, and **DENIED IN PART**.

## I.      BACKGROUND

There are three Plaintiffs in this case.  Plaintiff O.G. was formerly a student at Millburn High School.  Plaintiffs Daryl George and Brenda Barnes-George (the "Plaintiff Parents") are O.G.'s parents.

There are four Defendants in this case.  The first Defendant is the Board.  The other Defendants (the "Individual Defendants"), who are named as Defendants in their official and personal capacities, all worked in the Millburn School System.  Defendant Dr. Richard Brodow was Millburn's Superintendent of Schools; Dr. William Miron was the Principal of Millburn High School; and Dr. Michelle Pitts was the Vice Principal of Millburn High School.

Unless otherwise noted, the following facts are undisputed.  O.G. is an African-American male.  Defendants' Statement of Material Facts Not In Dispute ("DSM") ¶ 1, ECF No. 56-3.  O.G. enrolled at Millburn High School in September 2007.  *Id.*  During his time at Millburn High, O.G. was subjected to racist epithets and, at times, violence.  Following an altercation that occurred on January 9, 2009, O.G. was expelled from school.  O.G. was then home-schooled.  O.G.'s expulsion was ultimately commuted to a suspension, and O.G. was allowed to return to Millburn High School.  After graduating, O.G. went on to college at Morehouse University.

### A.      Incidents Involving O.G. Prior to January 9, 2009

#### 1.      Freshman Year

In March 2008, when he was a freshman, O.G. was involved in a physical altercation with a junior who was Asian-American (the "Junior").  *Id.* ¶ 4.  There is no evidence that O.G. and the Junior were involved in any prior or subsequent altercation.  *Id.* ¶ 7.  During the altercation, O.G.'s nose was broken.  Plaintiffs' Counterstatement of Contested Material Facts ("PSM") ¶ 6, ECF No. 57-2.  According to O.G., the Junior said he would "beat [O.G.'s] black ass."  *Id.* ¶ 4.  As a result of the altercation, the Junior was suspended for two days and O.G. was given five days detention.  *Id.* ¶ 7.  Though the incident with the Junior occurred in 2008, an accident report was not written until March 11, 2009.  *Id.* ¶ 10.  At her deposition, Vice Principal Pitts testified that, besides from this March 11, 2009 accident report, there are no records that "support any additional claims of race-based harassment, intimidation, discrimination or bullying during O.G.'s freshman year."  DSM ¶ 8.  However, O.G. testified that there were other occasions during his Freshman year when he was subject to race-based bullying.  Specifically, O.G. testified that his friends

(and apparently O.G., as well) were called names such as "wigger" and "wangster."  O.G. Dep. Tr. at 37:14-38:19, ECF Nos. 57-4 & 57-5.  O.G. testified that he would report these incidents to Dr. Pitts and fill out an incident report.  *Id.* at 38:22-25.  O.G. also testified that he did not know of any discipline handed down based on the incident reports he provided to Dr. Pitts.  *Id.* at 40:9-12.

2.      Sophomore Year Through January 8, 2009

Vice Principal Pitts testified at her deposition that she could not recall any reported incidents of race-based harassment or bullying involving O.G. from the beginning of O.G.'s sophomore year until January 8, 2009.  Pitts Dep. Tr. at 71:15-20, ECF No. 56-5.  O.G. testified differently.  He said that in his Sophomore year he reported to Dr. Pitts that another student told him, "get out of the way, blackie."  O.G. Dep. Tr. at 48:19-15.  O.G. testified that on another occasion, this same student stopped him in the hall and said, "yo, yo, blackie."  *Id.* at 49:17-50:12.  O.G. testified that the student took his ipod, told O.G. that he didn't "listen to nigger music anyway," and proceeded to drop the ipod on the ground.  *Id.*  O.G. testified that he reported this incident in an incident report.  *Id.* at 50:9-15.  O.G. testified that Dr. Pitts said she would do a full investigation but O.G. never heard of any discipline based on the investigation.  *Id.* at 51:21-52:6.  O.G. testified that on another occasion, the same student called him a "wigger."  *Id.* at 52:7-16.  Additionally, O.G. testified that Millburn High School students accosted him at a diner one weekend and called him a "tough nigger."  O.G. believes his father wrote a letter informing the school about the incident.  *Id.* at 55:17-58:16.

**B.      January 8, 2009 Incidents**

On January 8, 2009, O.G. was involved in an incident where two of his friends were pushed by upper-classmen who uttered racial comments.  DSM ¶ 11.  According to O.G., one of the aggressors called O.G. "nigger" and said that he "[didn't] like black people in [his] hallway."  PSM ¶ 23.  According to O.G., this student said he would beat O.G.'s "black ass."  *Id.* ¶ 23.  O.G. testified that the student then shoved O.G. and slammed O.G.'s head into a locker.  O.G. Dep. Tr. at 64:8-10.  Vice Principal Pitts's notes reflect a different story than the one offered by O.G.  According to Vice Principal Pitts's notes, which are undated, "the senior who hit [O.G.] made a rude remark which was in no way racist."  Motion for Summary Judgment ("MSJ"), Ex. I, ECF No. 56-12.

Later in the day, O.G. was again confronted by the upper-classmen involved in the earlier incident. DSM ¶ 12.  O.G. testified that the upperclassmen pushed O.G.'s friend,

3

and that they also punched and scratched O.G.  *Id.*  Two school staff members, Mr. Schilp and Ms. Osborne, were present during the altercation.  *Id.* ¶ 13.  In a written statement dated roughly six months after the fact, Mr. Schilp wrote that he did not see the beginning of the fight but he did observe O.G. and another student grappling.  *Id.* ¶ 14; MSJ, Ex. E, ECF No. 56-8.  Mr. Schilp stated that he did not see the beginning of the fight.  He further stated that he did not hear any racial comments uttered.  *Id.*  Like Mr. Schilp, Ms. Osborne also wrote a statement about the events roughly six months after it occurred.  MSJ, Ex. F, ECF No. 56-9.  In her statement, Ms. Osborne said that she saw O.G. throw his book bag down and proceed to hit another student.  While Ms. Osborne reported that another student involved in the altercation said to O.G., "[y]ou're fucking dead, faggot," Ms. Osborne did not report hearing any racial insults.  *Id.*

When this second incident was broken up, Vice Principal Pitts told O.G. to get medical attention in the nurse's office.  PSM ¶ 31.  O.G. returned from the nurse's office and told Vice Principal Pitts what happened.  Vice Principal Pitts said she would investigate.  *Id.* ¶ 32.

Later in the day, O.G. and his friends were confronted by a different group of students.  This group of students called O.G. a "nigger pussy," said they would "beat [O.G.'s] black ass," and prevented O.G. from entering a classroom.  DSM ¶ 16; PSM ¶ 34.  There was no physical contact, but a staff member named Ms. Cohen separated the students.  *Id.*  In a statement written more than five months after the fact, Ms. Cohen stated that she did not hear the other student say anything to O.G.  *Id.* ¶ 18; MSJ, Ex. G, ECF No. 11.  Instead, Ms. Cohen heard O.G. shout at the other student.  *Id.*

The students involved in this incident filled out incident reports reflecting the use of racially charged language. Opposition to Defendants' Motion for Summary Judgment, Exs. G-I, ECF Nos. 57-9, 57-10, 57-11.  Asked how he could have handled the situation differently, one of O.G.'s friends wrote, "I don't know happened too many times before."  ECF No. 57-9.  Vice Principal Pitts testified that when she spoke with students involved in the incident, they admitted to using the word "pussy" but denied using the word "nigger."  PSM ¶ 36.  Without calling any parents, Principal Miron and Vice Principal Pitts decided to schedule a mediation session for the next morning.  *Id.* ¶ 39.

## C.    January 9, 2009 Mediation

On January 9, 2009, Principal Miron and Vice Principal Pitts convened a mediation session with O.G. and some of the students involved in the previous day's altercations. During the session, the students voiced their grievances.  According to Principal Miron's notes, the students were told to "stop pushing buttons."  MSJ, Ex. J, ECF No. 56-13.

Principal Miron's notes indicate that the students at the session were told to see administrators for any individual discussions. *Id.* The notes also indicate that the students were advised of a "zero tolerance" policy regarding bullying. *Id.* Finally, the notes indicate that the students agreed to avoid confrontations and immediately report any "further occurrences." *Id.* No students were disciplined as a result of the mediation. PSM ¶ 40.

According to his notes from the mediation, Principal Miron learned at the mediation that "these 2 groups have been feuding for months without reporting it." MSJ, Ex. J. Similarly, Vice Principal Pitts's account of the mediation session states that "the soph [including O.G.] indicated that the seniors had been bothering them for a while but they neglected to report anything to the administrators." MSJ, Ex. I, ECF No. 56-12. O.G. takes issue with these statements to the extent they suggest that he did not report prior bullying. Plaintiffs' Response to Defendants' Statement of Material Facts ¶ 22, ECF No. 57-2.

### D.    January 9, 2009 Incident Involving a Baseball Bat

At some point on January 9, 2009, the day of the mediation, O.G. called his father and told him about threats from other students. DSM ¶ 23. O.G. confirmed that his father and brother would come to school at the end of the day to watch O.G.'s wrestling practice. *Id.*

At the end of the school day, O.G.'s father and brother arrived at the school. O.G. and his brother encountered the students involved in the incident from earlier in the day where O.G. was allegedly called a "nigger pussy." *Id.* ¶ 24. A heated exchange followed. *Id.* ¶ 25. O.G. claims that he was told, "we're going to kill you niggers." O.G. Dep. Tr. at 117:9-118:1. O.G. and his brother proceeded to go to their father's car, which was located in the school parking lot. DSM ¶ 25. O.G.'s brother took a baseball bat out of the trunk. O.G. and his brother then walked back towards the school and the people who were involved in the heated exchange from moments earlier. *Id.* ¶¶ 25-26. O.G. testified that he and his brother headed back towards the school because they were being chased by the other students and O.G.'s father told them not to get trapped in their car. O.G. Dep. Tr. at 121:9-17.

When O.G. and his brother headed back toward the school, they got into a fight with the other students. One student was hit by the baseball bat. DSM ¶ 27. O.G. maintains that he never touched the bat. PSM ¶ 47. At some point, O.G.'s father became involved in the fight. DSM ¶ 29. When the fight broke up, O.G., O.G.'s brother, and O.G.'s father got into their car and tried to leave the parking lot, but they were blocked by people who stood in the car's path. *Id.* ¶ 30. An ambulance came for the student who was hit with the

bat.  *Id.* ¶ 31.  Millburn police arrived on the scene and took O.G., O.G.'s brother, and O.G.'s father to the police station.  *Id.* ¶ 32.

### E.    O.G. Is Disciplined

1.    The Board Expels O.G.

On January 9, 2009, after the fight involving the baseball bat, Principal Miron and Superintendent Brodow wrote O.G.'s father a letter informing him that O.G. was suspended for nine days beginning on January 12, 2009.  Opposition to Defendants' Motion for Summary Judgment ("Opp."), Ex. L., ECF No. 57-14.  No disciplinary actions were taken against the other students involved in the incident with the baseball bat.  PSM ¶ 49. On January 13, 2009, Superintendent Brodow wrote a letter to O.G.'s father informing him that he had recommended that the Board either expel O.G. <u>or</u> suspend O.G. for one year. Opp., Ex. O.

A hearing before the Millburn Board of Education was scheduled for January 21, 2009, well within the 30 day window for hearings provided by New Jersey law.  DSM ¶ 35; N.J.A.C.  6A:16-7.3(a)(10)(iii) (requiring a hearing within 30 days of a student's suspension).  The January 21, 2009 hearing was adjourned so O.G. could retain counsel. DSM ¶ 35.  The hearing was rescheduled for February 2, 2009.  *Id.* ¶¶ 35-36.  The hearing was then adjourned a second time, this time because O.G.'s lawyer had a conflict and O.G. needed to secure replacement counsel.  *Id.* ¶ 36.  The hearing was rescheduled for February 11, 2009.  *Id.* ¶ 37.

On February 11, 2009, the Board convened to hear O.G.'s case.  Superintendent Brodow recommended expelling O.G.  Superintendent Brodow did not recommend suspending O.G.  PSM ¶ 54.  O.G. requested a third adjournment, arguing that the hearing should be put off until the resolution of criminal charges arising out of the baseball bat incident.  *Id.* ¶ 37.  O.G. wanted the hearing adjourned so that he could testify without waiving his Fifth Amendment privilege.  The Board President agreed to adjourn the hearing if O.G. agreed not to bring a civil suit against the Board.  *Id.* ¶ 38.  O.G. refused, and the hearing proceeded.  *Id.* ¶ 39.  Ten witnesses testified.  *Id.* ¶ 40.  O.G. was not among them. The witnesses included students, parents, and administrators.  *Id.*  The witnesses were subject to cross examination.  *Id.* ¶ 41.

Witnesses testified that when O.G. exited the school on January 9, 2009, O.G. and his brother threatened the other students.  Board Hearing Tr. at 19:1-10, 41:24-42:23, ECF Nos. 57-18, 57-19.  There was testimony that after an exchange of words, O.G. and his brother went to their father's car, that O.G.'s brother grabbed a baseball bat, and that the

brothers then headed back toward the school.  The student who was hit with the bat testified that O.G.'s brother hit him and that O.G. then grabbed him from behind.  *Id.* at 19:20-20:11.  After hearing this testimony, the Board voted to expel O.G.  *Id.* ¶ 42.  O.G. was then home-schooled.  O.G. Tr. at 137:19-22.

> ### 2. O.G. Appeals and Succeeds In Getting Expulsion Converted Into Suspension

On May 28, 2009, O.G. filed a verified petition of appeal with the Commissioner of Education of New Jersey.  MSJ, Ex. O, ECF No. 56-19.  In that petition, O.G. argued that the Board "acted arbitrarily, capriciously, and against the weight of the evidence by expelling O.G. and have otherwise violated O.G.'s rights under the State and Federal Constitutions by depriving him of a public education at Millburn High School."  *Id.*  A hearing was scheduled before the Office of Administrative Law on August 31, 2009 and October 6, 2009.  D.L.G. AND B.B-G ON BEHALF OF O.G. v. BOARD OF EDUCATION OF THE TOWNSHIP OF MILLBURN, ESSEX COUNTY ("ALJ Decision"), OAL DKT. NO. EDU 07239-09, slip op. at 2 (Sept. 22, 2010), ECF No. 56-20.  After O.G.'s counsel withdrew, the hearing was adjourned.  O.G. then retained new counsel.  O.G.'s new counsel then withdrew.  O.G. then retained a third lawyer.

Before the hearing began, O.G. filed a motion on March 18, 2010 seeking to vacate his expulsion, citing, among other things, procedural errors in the hearing process before the Board.  *Id.* at 3.  The Administrative Law Judge assigned to the case, Ellen S. Bass ("the ALJ") reserved decision.  The ALJ then took testimony over the course of three days spanning April and June 2010.  *Id.*  Vice Principal Pitts, Principal Miron, and Superintendent Brodow all testified.  *Id.* at 13.  Notably, Superintendent Brodow explained that while his letter to O.G.'s parents indicated that he was recommending a suspension or expulsion, he always believed an expulsion was proper.  *Id.* at 17.

Most importantly, the ALJ heard testimony from O.G.  The ALJ explained: "O.G.'s testimony offered insight into what the Board might have heard had it granted his adjournment request, and O.G. had chosen to testify."  *Id.* at 13.  O.G. testified that there was "an atmosphere of harassment and discrimination" at his school.  *Id.* at 13.  The ALJ noted that another student had testified before the Board that racial slurs were common at Millburn High School, and that O.G. was frequently called "nigger."  *Id.* at 11.  O.G. testified that on January 9, 2010, he was only trying to get away from other students when the fight broke out.  *Id.* at 14-16. O.G.'s testimony directly contradicted the testimony of other witnesses, who related that O.G. instigated a fight by threatening to shoot fellow students.  *Id.* at 16.

The ALJ stated: "[a]t the hearing before me, O.G. offered a version of the events that lacked credibility, and in no way caused me to question the reasonableness of the Board's decision below." *Id.* at 21. The ALJ recognized that O.G.'s description of the "racially charged atmosphere at Millburn High School" was "disturbing," but she also found that "no words or epithets could justify the violence that took place." *Id.*

While the ALJ found that "[t]he determination of the Board to impose an expulsion was reasonable under the facts it heard that evening," *id.* at 19, the ALJ concluded that as a matter of law the Board did not have the power to expel O.G, *id.* at 22. Citing to a recent decision from the New Jersey Commissioner of Education, *M.R. v. Board of Trustees of the Hoboken Charter School*, EDU 09662-09, Final Decision (March 22, 2010) http://lawlibrary.rutgers.edu/oal/search.html —a decision that the ALJ only learned about while she was reviewing the parties' post-hearing submissions—the ALJ held that because O.G. did not have a prior long-term suspension, the Board only had the power to issue a long-term suspension, not an expulsion. The ALJ ordered that O.G. be allowed to return to school.

In her decision, the ALJ also found that the Board did not violate O.G.'s due process rights. First, the ALJ noted that O.G.'s due process rights were not violated because the Board failed to grant a third adjournment. *Id.* at 20-21. The ALJ recognized that O.G. wanted an adjournment so that he could resolve pending criminal charges and then testify before the Board without waiving his Fifth Amendment privilege. However, the ALJ held that "there is no absolute right to a stay of a civil matter pending the outcome of criminal proceedings." *Id.* at 20. Second, the ALJ found that the Board did not act arbitrarily, capriciously, or unreasonably when the Board offered to adjourn the hearing on the condition that O.G. waive his civil charges. *Id.* at 21-22. The ALJ explained that this offer was a settlement offer and was understood as such by O.G.'s counsel.

O.G. appealed the ALJ's decision to the New Jersey Commissioner of Education. The Commissioner upheld the decision with one modification. MSJ, Ex. Q, ECF No. 56-21. The Commissioner held that the Board did not have to reinstate O.G. but could choose to continue the long term suspension. There was no appeal of the Commissioner's decision to the New Jersey Superior Court. O.G. ultimately returned to Millburn High School. As a result of what he had been through, including his expulsion, O.G. was diagnosed with Post Traumatic Stress Disorder. PSM ¶ 66. After he completed high school, O.G. enrolled at Morehouse University. O.G. Dep. Tr. at 145:3-4.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp*., 901 F.2d 335, 340 (3d Cir. 1990).  A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party.  *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

## III.    DISCUSSION

The Complaint contains 13 counts:

Count 1:      42 U.S.C. § 1983 (discrimination against freshman and sophomores)
Count 2:      42 U.S.C. § 1983 (discrimination based on race)
Count 3:      42 U.S.C. § 1983 (due process violations by the Board)
Count 4:      New Jersey Law Against Discrimination (hostile educational environment)
Count 5:      New Jersey Constitution (discrimination based on race)
Count 6:      New Jersey Constitution (due process violations by the Board)
Count 7:      New Jersey Civil Rights Act (discrimination based on race)
Counts 8-10: New Jersey Law Against Discrimination (supervisor liability)
Count 11:     Damages (money spent challenging expulsion)
Count 12:     Damages (money spent homeschooling O.G.)
Count 13:     Damages (money spent litigating over O.G.'s expulsion)

All 13 counts are brought by O.G, by O.G.'s parents in their parental capacity, and by the Plaintiff Parents in their individual capacity.  Counts 1-2, 4-7, and 11-13 are brought against the Board and the Individual Defendants in their official and personal capacity.  Count 3 is brought against the Board and Superintendent Brodow in his official and personal capacity.  Counts 8-10 are brought against the Individual Defendants in their official and personal capacity.  While the Complaint suggests that Counts 8-10 are directed

at the Board, as well, the briefing clarifies that these counts are directed solely at the Individual Defendants.

Defendants move for summary judgment on all claims. Defendants also move to strike O.G.'s request for punitive damages.

The Court begins by considering O.G.'s claims. The Court then considers the claims brought by the Plaintiff Parents in their individual capacity.

### A.    O.G's Claims

This section is divided into three parts. First, the Court considers O.G.'s claims against the Board. Second, the Court considers O.G.'s claims against the Individual Defendants. Finally, the Court considers whether O.G. can recover punitive damages on his remaining claims.

### 1.    O.G.'s Claims Against the BOARD

O.G. makes three types of claims against the Board.

First, in Counts 3 and 6, O.G. asserts due process claims under the federal and New Jersey Constitutions. These claims concern the conduct of the Board when it expelled O.G. The Board moves for summary judgment on Counts 3 and 6, arguing that the doctrine of collateral estoppel forecloses O.G.'s due process challenge.

Second, in Counts 1-2 and 4-7, O.G. asserts discrimination claims under Section 1983, the New Jersey Law Against Discrimination (the "LAD"), the New Jersey Constitution, and the New Jersey Civil Rights Act. The Board moves for summary judgment on these claims, arguing that it properly addressed any discrimination that it learned about.

Third, in Counts 11-13, O.G. asserts freestanding claims for damages against the Board. Here, O.G. seeks to recover money spent on litigation, money paid for homeschooling, and money that would compensate him for emotional and reputational injuries. The Board moves for summary judgment on these claims, arguing that they do not constitute causes of action.

### a.    Due Process Claims (Counts 3 and 6)

In Counts 3 and 6, brought respectively under 42 U.S.C. § 1983 and Article 1, Paragraph 5 of the New Jersey Constitution, Plaintiffs allege that the Board violated O.G.'s due process rights in three ways. First, the Board refused to adjourn the hearing for a third

time.  Second, the Board conditioned an adjournment offer on O.G.'s willingness to waiving his right to bring a civil suit.  Third, contrary to his written recommendation, which recommended a suspension or an expulsion, Superintendent Brodow's only recommendation at the Board hearing was that O.G. should be expelled.  Defendants argue that regardless of whether any of O.G.'s three due process arguments succeed, they are foreclosed by the doctrine of collateral estoppel.

The Court need not reach the collateral estoppel issue.  If collateral estoppel applies here, then summary judgment is proper on Counts 3 and 6 at least with respect to O.G.'s first and second due process challenges.  If collateral estoppel does not apply here, and the Court has to address the due process issue in the first instance, the Court would still find, for the reasons that follow, that none of O.G.'s three arguments establish a due process violation.  Accordingly, whether or not collateral estoppel applies, Counts 3 and 6 fail.

To prevail on a due process claim under Section 1983, a plaintiff must prove five things:

1.  that he was deprived of a protected liberty or property interest;
2.  that this deprivation was without due process;
3.  that the defendant subjected the plaintiff, or caused the plaintiff to be subjected to, this deprivation without due process;
4.  that the defendant was acting under color of state law; and
5.  that the plaintiff suffered injury as a result of the deprivation without due process.

*Sample v. Diecks*, 885 F.2d 1099, 1113-1114 (3d Cir. 1989).  The correct standard of causation to apply in Section 1983 cases is proximate causation.  *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000).  Proximate causation obtains when "a person's wrongful conduct which . . . a substantial factor in bringing about harm to another."  *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004).

The Court finds that the Board did not violate O.G.'s due process rights.  First, the Board did not violate O.G.'s rights when it refused to grant a third adjournment.  "The Constitution . . . does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings."  *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980) (en banc) (emphasis added).  Furthermore, even if O.G. was deprived of a liberty or property interest, O.G. cannot establish proximate causation.  O.G.'s argument is that he needed an adjournment so he could testify without waiving his Fifth Amendment rights.  When the proceeding went before the ALJ, O.G. did testify, and the ALJ found that O.G.'s

testimony would not have changed the Board's mind.  Accordingly, O.G. cannot establish that the denial of his adjournment request was a "substantial factor" in his expulsion.

Next, the Board did not violate O.G.'s due process rights when it offered to adjourn the hearing on the condition that O.G. waive his right to file a civil lawsuit.  The Board's offer—which O.G.'s lawyer refused—did not violate O.G.'s due process rights because it did not deprive O.G. of a liberty or property interest.

Finally, the Board did not violate O.G.'s due rights when it came to Superintendent Brodow's recommendation.  At the hearing, Superintendent Brodow recommended expelling O.G.  It is true that Superintendent Brodow has previously recommended that O.G. either be expelled <u>or</u> suspended.  But the Court fails to see how the different recommendation violated O.G.'s rights.  O.G. was on notice that Superintendent Brodow was contemplating an expulsion.  *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.") (internal quotations and citations omitted).  Moreover, the parties have not directed the Court to any evidence establishing that Superintendent Brodow's recommendation proximately caused O.G.'s expulsion.  As the ALJ noted, "the ultimate determination whether to impose the recommended discipline rest[ed] in the discretion of the board." ALJ Decision at 18.  Accordingly, O.G. cannot prevail on his due process claims.  The Court will **GRANT** summary judgment on Counts 3 and 6.

> b.      Discrimination Claims (Counts 1, 2, 4, 5, and 7)

Next, the Court turns to O.G.'s discrimination claims against the Board.  These claims are pled under Section 1983, the LAD, the New Jersey Constitution, and the New Jersey Civil Rights Act.

> i.      LAD: Hostile Educational Environment (Count 4)

Count 4, O.G.'s LAD claim against the Board, survives summary judgment.

"The purpose of the LAD is to eradicate discrimination whether intentional or unintentional."  *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 604 (1993).  "[T]he LAD permits a cause of action against a school district for student-on-student harassment based on [race] if the school district's failure to reasonably address that harassment has the effect of denying to that student any of a school's 'accommodations, advantages, facilities or privileges.'"  *L.W. v. Toms River Reg'l Schs. Bd. of Educ.*, 189 N.J. 381, 402 (2007) (quoting N.J.S.A. 10:5–12(f)).  The New Jersey Supreme Court has cautioned, however,

that a student does not have a claim under the LAD based on "isolated schoolyard insults or classroom taunts." *Id.* at 402.

For a student to establish a race-based harassment claims against a school district under the LAD, the student must prove (1) "discriminatory conduct that would not have occurred 'but for' the student's protected characteristic," (2) "that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment," and (3) "the school district knew or should have known of the harassment, but failed to take action reasonably calculated to end the harassment." *Id.* at 402-03. With respect to the final prong, the LAD recognizes vicarious liability: a supervisor's actual or constructive knowledge can be imputed to a school district. *See E.K. v. Massaro*, No. 12-2464, 2013 WL 5539357, at *8 (D.N.J. Oct. 7, 2013) ("[A] school is liable for a hostile school environment when it grants a supervisor authority to control the school environment and the supervisor either abuses that authority or has actual or constructive knowledge of the harassment and fails to take effective measures to end the discrimination.") (internal quotations and citations omitted); *see also Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 620 (1993) ("We recognize that although we have declined to hold employers strictly liable for hostile work environment sexual harassment by supervisors, we have created a standard that may often result in employers being held vicariously liable for such harassment . . . An employer will be found vicariously liable if the supervisor acted within the scope of his or her employment."). Also, for purposes of the third prong, reasonableness is determined based on the totality of circumstances. *Id.* at 408. The analysis is fact-sensitive. *Id.* at 409. Factors to consider in determining reasonableness are:

- students' ages, developmental and maturity levels;
- school culture and atmosphere;
- rareness or frequency of the conduct;
- duration of harassment;
- extent and severity of the conduct;
- whether violence was involved;
- history of harassment within the school district, the school, and among individual participants;
- effectiveness of the school district's response;
- whether the school district considered alternative responses; and
- swiftness of the school district's reaction.

*Id.* at 409.  "With those and other considerations in mind, factfinders must consider the cumulative effect of all student harassment and all efforts of the school district to curtail the maltreatment."  *Id.*  The New Jersey Supreme Court has noted that "a reasonable response to name-calling among grade-schoolers may be inadequate to address violence among teenagers."  *Id.*

Disputed facts prevent the Court from granting summary judgment on Count 4. O.G. testified that he, as a black student, was subject to a host of vile epithets including the word "nigger."  As such, O.G. has set forth evidence of "discriminatory conduct that would not have occurred 'but for' the student's protected characteristic."  Construed in the light most favorable to Plaintiffs, the record establishes that O.G. got into a fight with someone who said he would beat O.G.'s "black ass" and then broke O.G.'s nose, that O.G. was called "wigger" and "wangster on various occasions, that O.G.'s ipod was taken by someone who referred to "nigger music," that O.G.'s friend was pushed in the hallway by a group of students who said they "[didn't] like black people in [the] hallway," that O.G. was punched and scratched by these same students, and that O.G. was called a "nigger pussy."  According to one Millburn High School student, there was "an atmosphere of harassment and discrimination" at Millburn High School, and that O.G. was frequently called "nigger."  ALJ Decision at 13.  Notes taken by Principal Miron during the mediation session indicate that O.G.'s group and another group had been "feuding for months."  A jury could find, based on this evidence, that the "a reasonable student of the same age, maturity level, and protected characteristic" as O.G. would find that the treatment O.G. experienced was "sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment."  *L.W.*, 189 N.J. at 402.

Next, a jury could find that the Board knew or should have known about the racist bullying O.G. was experiencing.  A jury could make this finding because it could find that a supervisor, Vice Principal Pitts, had "actual or constructive knowledge of the harassment."  *Joyce*, 2008 WL 906266, at *23.  Specifically, a jury could find, based on O.G.'s testimony, that besides from the fight O.G. got into freshman year and the incidents that took place on January 8, 2009, Vice Principal Pitts knew about additional instances of race-based harassment from O.G.'s written reports.  Defendants deny that O.G. filed these reports.  Only a jury can resolve that dispute.

Lastly, a jury could find that the school's response to the harassment experienced by O.G. was not reasonable.  As noted by the New Jersey Supreme Court, the reasonableness determination is highly fact specific.  *L.W.*, 189 N.J. at 409.  A jury might decide, for example, that a mediation session that failed to mete out any punishment was too little too late given what was going on between O.G. and his peers.  Moreover, if a jury were to credit O.G.'s testimony that he reported other instances of racism and nothing was

done in response, a jury could also find that the school's response was inadequate. Accordingly, the Court will **DENY** summary judgment on Count 4.

### ii.    Section 1983 (Counts 1-2)

Count 1 is a Section 1983 claim alleging that the Board failed to prevent bullying against freshman and sophomores.  Count 2 is a Section 1983 claim alleging that the Board failed to prevent racially motivated harassment.  Defendants' only argument in support of summary judgment on these claims is that "Plaintiffs have failed to plead any specific violations of federal rights elsewhere conferred and have left it up to the Court to identify the constitutional or statutory rights of which they were allegedly deprived to trigger their § 1983 claim."  MSJ at 18.

With respect to Count 1, the Court agrees with Defendants that summary judgment is proper: there is no Constitutional right that protects students from being bullied because they are freshmen and/or sophomores.  Accordingly, the Court will **GRANT** summary judgment on Count 1.

With respect to Count 2, Plaintiffs' claims of racial discrimination by state actors are obviously grounded in the Fourteenth Amendment's equal protection guarantee.  Under *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1978), "a school board can be held responsible for a constitutional violation of a teacher only if the violation occurred as a result of a policy, custom or practice established or approved by the board."  *C.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000).  However, a school board cannot be held liable for a constitutional violation under a *respondeat superior* theory.  *Id.*  Here, there is no evidence that the Board established or approved a policy, custom, or practice of allowing Millburn High School administrators to effectively turn a blind eye to student-on-student racial harassment.  Accordingly, the Court will **GRANT** summary judgment on Count 2.

### iii.    New Jersey Civil Rights Act (Counts 5 and 7)

Counts 5 is a discrimination claim under Article I, Paragraph 5 of the New Jersey Constitution.  Count 7 is a discrimination claim under the New Jersey Civil Rights Act. The counts are essentially redundant. *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 444 (D.N.J. 2011) (New Jersey Civil Rights Act provides a cause of action to address violations of rights conferred by the New Jersey Constitution).  Because the Court has already granted summary judgment on the analogous discrimination claim under the federal Constitution, and since the New Jersey Constitution is interpreted analogously to

the federal Constitution, *see id.*, the Court will **GRANT** summary judgment on Counts 5 and 7.

### c.     Standalone Claims For Damages (Counts 11-13)

The final set of claims against the Board are standalone claims for damages.  Count 11 seeks costs incurred challenging O.G.'s expulsion.  Count 12 seeks costs incurred homeschooling O.G. after the expulsion.  Count 13 seeks damages for emotional distress and harm to reputation.  Defendants move for summary judgment on Counts 11-13, arguing that they do not constitute independent causes of action. Defendants are correct.  Because Counts 11-13 do not constitute independent causes of action, the Court will **GRANT** Defendants' motion for summary judgment.

### 2.     O.G's Claims Against The INDIVIDUAL Defendants

Based on the Court's earlier discussion, the Court will **GRANT** summary judgment in favor of the Individual Defendants on Counts 1, 6, 11, 12, and 13, and it will **GRANT** summary judgment in favor of Defendant Brodow (in his personal and official capacity) on Count 3.  In this section, the Court will address the additional claims against the Individual Defendants: the supervisory liability claims under the LAD (Counts 8-10) and the Section 1983 and New Jersey Civil Rights Act claims alleging racial discrimination.

### a.     LAD (Counts 4, 8-10)

Plaintiffs' LAD claim in Count 4 is directed against the Individual Defendants, as well as the Board.  However, individual liability under the LAD can only arise through aiding and abetting liability.  *See Cicchetti v. Morris Cnty. Sheriff's Office*, 194 N.J. 563, 594 (2008).  Accordingly, the Court will **GRANT** summary judgment in favor of the Individual Defendants on Count 4.

Next, the Court addresses Counts 8-10, the aiding and abetting claims brought against the Individual Defendants under the LAD.  The LAD provides that a supervisor can be liable for aiding and abetting discrimination based on "active and purposeful conduct."  *Tarr v. Ciasulli*, 181 N.J. 70, 83 (2004).  Supervisors can also be liable if they act with deliberate indifference.  *See Lopez-Arenas v. Zisa*, No. 10-2668, 2012 WL 933251, at *10 (D.N.J. Mar. 19, 2012).  While Defendants contend that the LAD does not recognize the imposition of personal liability, they are mistaken.  *See Fasano v. Federal Reserve Bank*

*of New York*, 457 F.3d 274, 289 (3d Cir. 2006) ("The LAD permits the imposition of individual liability of an employee who has aided or abetted barred acts.").

Here, Plaintiffs point to no evidence that Superintendent Brodow or Principal Miron actively violated O.G.'s rights or exhibited deliberate indifference to the alleged violation of those rights. Accordingly, the Court will **GRANT** summary judgment in favor of Superintendent Brodow and Principal Miron in their personal and official capacity on Counts 8-10.

However, the Court cannot reach the same result for Vice Principal Pitts. O.G. claims that he reported numerous instances of race-based harassment to Vice Principal Pitts, and that, besides from suspending the Junior who O.G. fought with when O.G. was a Freshman, Vice Principal Pitts did nothing to address O.G.'s complaints until the mediation session in January of O.G.'s Sophomore year. Vice Principal Pitts, on the other hand, maintains that O.G. did not provide her with reports of race-based harassment. Clearly, the facts here are disputed. As such, the Court will **DENY** summary judgment against Vice Principal Pitts on Counts 8-10 in her personal and official capacity.[1]

> **b.**     Constitutional Claims Against the Individual Defendants (Counts 2, 5, and 7)

In this section, the Court considers the constitutional claims against the Individual Defendants. The Court begins by considering the claims brought against the Individual Defendants in their official capacities. The Court then considers the claims brought against the Individual Defendants in their personal capacities.

> **i.**     Constitutional Claims Against the Individual Defendants in Their Official Capacities

Count 2 is a Section 1983 claim against the Individual Defendants in their official and personal capacities. To the extent Count 2 is brought against the Individual Defendants in their official capacities, Count 2 is redundant of the claims seeking to impose liability against the Board. Accordingly, the Court will **GRANT** summary judgment on Count 2 to the extent Count 2 is directed against the Individual Defendants in their official

---

[1]     The parties have not directed the Court to caselaw that addresses the official capacity/personal capacity distinction when it comes to LAD claims, and the Court has been unable to locate any on-point authority. Since Defendants' arguments relating to Plaintiffs' official capacity claims are directed solely at Plaintiffs' Section 1983 claims, the Court will allow both the official and personal capacity LAD claims to proceed against Vice Principal Pitts.

capacities. *See Dull v. West Manchester Tp. Police Dept.*, No. 7-0307, 2008 WL 717836, at *7 (M.D. Pa. Mar. 17, 2008) ("Claims asserted against both a government entity and the entity's agents in their official capacity warrant dismissal of the redundant official-capacity suits."). Since Courts interpret the New Jersey Civil Rights Act analogously to Section 1983, the Court will also **GRANT** summary judgment on Counts 5 and 7 to the extent those counts are directed against the Individual Defendants in their official capacities.

ii. Constitutional Claims Against the Individual
Defendants in Their Personal Capacities

Next, the Court turns to the constitutional claims asserted against the Individual Defendants in their personal capacities. The Individual Defendants argue that qualified immunity requires the Court to grant summary judgment on these claims.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223 (2009) (internal quotations and citations omitted). Qualified immunity is only available to officials named as defendants in their personal capacity. *See Duran v. Merline*, 923 F. Supp. 2d 702, 713 (D.N.J. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985)). In deciding whether qualified immunity applies, the Court asks two questions. First, did the official's conduct violate a constitutional or federal right? *Ray v. Twp. of Warren*, 626 F.3d 170, 174 (3d Cir. 2010). Second, was that right "clearly established"? *Id.* Qualified immunity applies to O.G.'s federal and state constitutional claims. *See Sussino v. New Jersey Division of State Police*, No. 9-6278, 2012 WL 5184582, at *7 (D.N.J. Oct. 18, 2012) ("Although the Third Circuit has yet to weigh in on the subject, other district courts have either held or assumed that claims brought under the [New Jersey Civil Rights Act] may be subject to a qualified immunity defense.").

1. Did the Individual Defendants Violate O.G.'s
Constitutional Rights?

In *Gant ex rel. Gant v. Wallingford Board of Education*, 195 F.3d 134, 140-41 (2d Cir. 1999), the Second Circuit held that in certain circumstances, school administrators can be liable under the Fourteenth Amendment for deliberate indifference to student-on-student racial harassment. *See also DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012) (denying summary judgment where kindergartener was called "nigger" 8-15 times and teacher took no action); *Doe v. Cape Henlopen School Dist.*, 759 F. Supp. 2d 522, 531-32 (D. Del. 2011)

(applying deliberate indifference standard in equal protection case alleging hostile school environment).  To establish an administrator's deliberate indifference to racial harassment, a plaintiff must prove that:

> (1)     the child in question was in fact harassed by other students based on his race;
>
> (2)     . . . such race-based harassment was actually known to the defendant school official; and
>
> (3)     the defendant's response to such harassment was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur.

*DiStiso*, 691 F.3d at 241 (internal quotations and citations omitted)

While the Third Circuit has not addressed whether the Fourteenth Amendment protects students from a school's deliberate indifference to student-on-student racial harassment, another judge in this District has.  In *Joyce v. Sea Isle City*, No. 4-5345, 2008 WL 906266, at **17-18 (D.N.J. March 31, 2008), the Honorable Robert Kugler held that under the Third Circuit's decision in *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992), a Plaintiff cannot recover under the equal protection Clause for a school's deliberate indifference to racial discrimination perpetrated by fellow students.  This Court respectfully disagrees with *Joyce*'s reading of *D.R.*  The *D.R.* case concerns a school's liability under the Fourteenth Amendment's Due Process clause when a student is sexually assaulted by another student.  Discrimination by fellow students—the conduct alleged in this case—differs from the sexual violence that is the focus of *D.R.*  As the Second Circuit has put it, "deliberate indifference to such [student-on-student] harassment can be viewed as discrimination by school officials themselves," *Gant*, 195 F.3d at 140 (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999)).  Because *D.R.* failed to engage this issue, it is inapposite.  Accordingly, the Court will follow the Second Circuit's on-point decision in *Gant*.

Here, Defendants do not point to any evidence establishing that Superintendent Brodow or Principal Miron both knew about the harassment of O.G. and then responded to that harassment in a clearly unreasonable manner.  Accordingly, the Court will **GRANT** summary judgment on Counts 2, 5, and 7 to the extent those counts are directed against Superintendent Brodow or Principal Miron in their personal capacities.

On the other hand, a reasonable jury might conclude that Vice Principal Pitts knew about the harassment and failed to act in a reasonable manner to address that harassment. As such, the Court must proceed to the second step and determine whether the undisputed facts establish that Vice Principal Pitts violated O.G.'s clearly established constitutional rights.

### 2. Were O.G.'s Constitutional Rights Clearly Established?

For purposes of the qualified immunity analysis, a right is clearly established if "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Good v. Dauphin County Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent." *Id.* To determine whether a right is clearly established, there need not be a case "directly on point," however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

In *DiStiso*, the Second Circuit found that there was a clearly established Fourteenth Amendment right protecting a student from an administrator's deliberate indifference to racial harassment by other students. 691 F.3d at 240. However, the Second Circuit explained that the right was clearly established since the Second Circuit decided *Gant*. As discussed earlier, the Third Circuit has no case that is analogous to *Gant*. While the Tenth Circuit agrees with *Gant* that a school administrator's deliberate indifference to student-on-student racial harassment violates the Fourteenth Amendment, *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1250 (10th Cir. 1999), the district courts in this circuit have parted ways on the question. *Compare Cape Henlopen*, 759 F. Supp. 2d at 531-32 (recognizing right under Fourteenth Amendment), *with Joyce*, 2008 WL 906266, at **17-18 (rejecting right under Fourteenth Amendment). Accordingly, the Court finds that the Fourteenth Amendment right at issue here is not clearly established. It follows that qualified immunity applies to the constitutional claims directed at Vice Principal Pitts in her personal capacity. Accordingly, the Court will **GRANT** summary judgment on Counts 2, 5, and 7 to the extent those counts are directed against Vice Principal Pitts in her personal capacity.

    3.  O.G.'s Request for Punitive Damages

  O.G. seeks punitive damages under Section 1983, the New Jersey Civil Rights Act, and the LAD.  The LAD claims are the only claims that survive summary judgment.  The Court finds that O.G. may seek punitive damages under the LAD.

  Unlike Section 1983 and the New Jersey Civil Rights Act, the LAD allows plaintiffs to recover punitive damages against a municipality.  *Gares v. Willingboro Twp.*, 90 F.3d 720, 728 (3d Cir. 1996); *Cavuoti v. New Jersey Transit Corp.*, 161 N.J. 107, 133 (1999).  The LAD also provides for punitive damages against supervisors who work for municipalities if the supervisors aid and abet discriminatory conduct.  *See Oras v. Hous. Auth. Of Bayonne*, 373 N.J. Super. 302, 318 (App. Div. 2004) (refusing to strike punitive damage claim under the LAD against Bayonne Housing Authority Executive Director).

  To qualify for punitive damages under the LAD, a plaintiff must establish two things.  First, the plaintiff must establish "actual participation in or willful indifference to the wrongful conduct on the part of upper management."  *Rendine*, 141 N.J. at 314.  In *Cavuoti v. New Jersey Transit Corp.*, the New Jersey Supreme Court explained:

> it is fair and reasonable to conclude that upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the  workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers).

*Cavuoti*, 161 N.J. at 561.  The New Jersey Supreme Court added:

> For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace. Obviously such instructions should be tailored to the facts of the case . . . .

*Id.*

Second, the plaintiff must establish that the "offending conduct" was "especially egregious." *Id.* at 551. The New Jersey Supreme Court has explained the latter requirement as follows: "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 49 (1984). Furthermore, "the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Rendine*, 141 N.J. at 314 (internal citations and quotations omitted).

While the parties discuss New Jersey's general punitive damages statute, the parties fail to address the LAD-specific punitive damages standard. Based on the summary judgment record now before the Court, it appears that a jury could potentially award punitive damages under the LAD. To begin, Vice Principal Pitts apparently satisfies the first prong of the LAD's punitive damages test—the "upper management" prong—since Vice Principal Pitts appears to control at least some of the day-to-day operations at Millburn High School and since Vice Principal Pitts apparently has the power to "execute the employer's policies to ensure a safe, productive and discrimination-free workplace." *Cavuoti*, 161 N.J. at 129. It also appears that Vice Principal Pitts satisfies the second, "willful disregard" prong since O.G. alleges that Vice Principal Pitts refused to act when O.G. complained about race-based harassment. Accordingly, the Court will **DENY** the Defendants' request to strike the punitive damages in the LAD claims brought against the Board and Vice Principal Pitts. The Court will be willing to revisit this decision at trial.

## B.    Claims of Plaintiff Parents in Their Individual Capacity

The Plaintiff Parents sue in both their individual capacity and also in their capacity as O.G.'s parents and guardians. Defendants argue that summary judgment is proper on the claims O.G.'s parents bring in their individual capacity because the Plaintiff Parents lack standing in their individual capacity. Defendants also argue that summary judgment is proper on the claims the Plaintiff Parents bring in their individual capacity because the undisputed facts require judgment in Defendants' favor. The Court is persuaded by the second argument but not the first.

Under Article III of the United States Constitution, a plaintiff must have standing to bring suit in federal court. Standing involves three elements:

(1)     the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2)     there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and

(3)     it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 484-85 (3d Cir. 1998).  Defendants argue that the Plaintiff Parents lack Article III standing to sue in their individual capacity because they did not suffer an injury in fact.  The Court disagrees.  In *Winkleman v. Parma City Sch. Dist.*, 550 U.S. 516, n.3 (2007), the Supreme Court recognized that parents had Article III standing to challenge procedural violations in their son's administrative due process hearing.  The parents had standing because they had a "concrete interest in the outcome of the proceeding, [namely] . . . an interest in having their child receive an appropriate education."  *Id.*  Here, the Plaintiff Parents had an interest in the outcome of the Board hearing: they had an interest in keeping their son in school.  They also had an interest in ensuring their son received an education free from discrimination. Accordingly, the Plaintiff Parents have Article III standing to bring claims in their individual capacity.

However, the Plaintiff Parents cannot proceed to trial on the claims they assert in their individual capacity.  To begin with, the Plaintiff Parents cannot recover in their individual capacity under Section 1983.  The parties have not directed the Court to any cases that have addressed whether Section 1983 allows parents to recover under the equal protection clause for discrimination experienced by their child.  However, the Ninth Circuit has recognized that "a party bringing a discrimination action must, as a prudential matter, assert his own rights and interests, not those of third parties."  *Estate of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086, 1093 (9th Cir. 2001).  In *McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003), the Third Circuit refused to recognize a parent's due process claim under the Fourteenth Amendment where the parent's adult son was shot by police officers. The Third Circuit explained that "we are hesitant to extend the Due Process Clause to cover official actions that were not deliberately directed at the parent-child relationship."  *See McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003).  Following this guidance, the Court

finds that the Plaintiff Parents cannot recover in their individual capacity under Section 1983 for the alleged violation of their son's equal protection rights.   Based on this conclusion, it follows that the Plaintiff Parents cannot recover in their individual capacity under the New Jersey Civil Rights Act for the violation of their son's equal protection rights.  *See Trafton*, 799 F. Supp. 2d 417 at 443.

Next, the Plaintiff Parents parents cannot recover in their individual capacity under the LAD because there is no evidence that any discrimination was directed at the Plaintiff Parents.  *See Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 500 (App. Div. 2005) ("[The NJLAD] did not intend to establish a cause of action for any person other than the individual against whom the discrimination was directed.").

Finally, the Plaintiff Parents argue that they can recover in their individual capacities under a theory of intentional emotional distress or negligent emotional distress.  Even if the Court were to construe one of Plaintiffs' claims as a claim for emotional distress, no reasonable jury could find for the Plaintiff Parents on such a claim.  To prevail on an intentional infliction of emotional distress claim, a plaintiff must establish emotional distress that is "so severe that no reasonable man could be expected to endure it."  *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 367 (1988).  To prevail on a negligent infliction of emotional distress claim, a plaintiff must establish "severe emotional distress."  *Portee v. Jaffee*, 84 N.J. 88, 101 (1980).  Here, the Plaintiff Parents have not directed the Court to any evidence establishing that they experienced such a significant level of distress.  Accordingly, the Court will **GRANT** summary judgment on the claims that the Plaintiff Parents bring in their individual capacities.

## IV.   CONCLUSION

For the above-stated reasons, the Court will **GRANT IN PART**, and **DENY IN PART** Defendants' motion for summary judgment.  The Court rules as follows:

- Summary judgment is **GRANTED IN PART**, and **DENIED IN PART** on O.G.'s claims against the Board.  Summary judgment is **GRANTED** on Counts 1, 2, 3, 5, 6, 7, 11, 12, and 13.  Count 4 survives against the Board.  Plaintiffs may seek punitive damages against the Board under Count 4.
- Summary judgment is **GRANTED IN PART**, and **DENIED IN PART** on O.G.'s claims against Vice Principal Pitts.  Summary judgment is **GRANTED** on Counts 1, 2, 4, 5, 6, 7, 11, 12, and 13.  Counts 8-10 survive against Vice Principal Pitts in her personal and official capacity.  Plaintiffs may seek punitive damages against Vice Principal Pitts under Counts 8-10.

- Summary judgment is **GRANTED** on all of O.G.'s claims against Superintendent Brodow and Principal Miron.
- Summary judgment is **GRANTED** on all claims brought by the Plaintiff Parents.

_____/s/ William J. Martini_____
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: July 23, 2014**